**Dated: October 02, 2025.**

_Christopher G. Bradley_
_____
**CHRISTOPHER G. BRADLEY**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | | |
| **LAURENCE MICHAEL RAMIREZ AND LEAN RANDELL WORTMAN** | § § § § | **Case No. 24-11109-cgb** <br><br> **Chapter 7** |
| Debtors. | | |
| **GARY GIARRATANO,** | § | |
| Plaintiff, | § § | |
| v. | § | |
| **LAURENCE RAMIREZ A/K/A LAURENCE LEFORTUNE, LEAN WORTMAN A/K/A LEANN LEFORTUNE, FFTX HOLDING, LLC, FORTUNATE FOUNDATIONS, LLC,  FFTX HOLDING, LLC-6107P, PROTECTED SERIES, FFTX HOLDING, LLC-6206F2, PROTECTED SERIES, 202311WY-04, LLC, 2021 TX02, LLC, AND 2021 TX-05, LLC,** | § § § § § § § § § § § § § § | **Adv. No. 24-01069-cgb** |
| **Defendants.** | § | |

1

## MEMORANDUM OPINION ON DISCHARGEABILITY OF DEBTS

### Introduction

In this opinion, the Court holds that the debts owed by the debtor-defendants should be discharged. The debtor-defendants have not been shown to have incurred a debt to the plaintiff by committing fraud or willful or malicious injury, and they have not been shown to have misused the entity-defendants such that the veil should be pierced or the entities should be treated as alter egos of the debtors. The Court holds that two of the entity defendants, FFTX Holding, LLC – 6107P, Protected Series and FFTX Holding LLC – 6206F2, Protected Series, breached their contracts to make certain payments to the plaintiff. The Court will consider damages and attorney's fees for that breach in due course.

### Jurisdiction and Authority

The Court has authority to adjudicate this matter pursuant to the District Court's Standing Order of Reference.[1] It is related to the main bankruptcy case, *In re Ramirez*.[2] The Court has jurisdiction over this matter under 28 U.S.C. §§ 157(b)(2), (c)(2), and 1334(b). All parties filed statements consenting to the Court's authority to enter a final judgment in this adversary proceeding.[3]

### Factual Background

This case emerges from a real estate deal gone bad. Debtor-defendants Laurence Ramirez and LeAn Wortman, known as Laurence and LeAn LeFortune, got married after meeting at a real estate investment seminar. The pair's real estate investment business was initially focused on remodeling residential properties, but eventually, they shifted their business model to new construction. Typically, the LeFortunes would buy a lot, tear down any existing homes, and build multiple new homes on the lot. At first, the business was focused on building homes to sell, but as a result of the shifting real estate market and interest rates after the COVID-19 pandemic, they switched to short-term rental projects.

---

[1] Order of Reference of Bankruptcy Cases and Proceedings (W.D. Tex. Oct. 4, 2013).
[2] Case No. 24-11109 (Bankr. W.D. Tex.).
[3] ECF Nos. 12, 15, 115.

The LeFortunes' investment model typically worked as follows: once they had identified a property, they would acquire a construction loan. They would form a new LLC for each property.[4] Then, LeAn would reach out to potential investors acting in her capacity as manager of the new LLC.[5] Upon investing, the investor would receive a membership interest in the LLC. The investor would sign an agreement with the LLC that obligated the LLC to pay monthly interest payments on the investment. The investor was expected to co-guarantee a loan on the property so that the construction loan could be rolled into a mortgage with a more favorable interest rate.[6] The property would be placed into the LLC once this refinancing took place.[7]

In early 2023, the LeFortunes approached Gary Giarratano about investing in two new builds that would be used as short-term rentals in East Austin: three units on a lot located on Palm Circle and another home located on part of a lot on Felix Avenue (the LeFortunes' enterprise was separately working on the second part of this lot). Mr. Giarratano invested $200,000 in the Palm Circle project and $100,000 in the Felix Avenue project with the debtors' business enterprise. The proposed investments are described in a pitch deck at Plaintiff's Exhibit 19. In brief, Giarratano was to invest cash and serve as "co-guarantor" on new long-term loans that were to be procured on each project to "take out" existing, higher interest rate construction loans.[8] The debtors, through their various entities, were to develop and run the properties as income-producing short-term rentals.[9] Each investment was to be "secured" by a membership (ownership) interest in an LLC that would be the "owning entity" of each property. There would be sizable bank loans constituting roughly 75% of the value of the homes at the time of purchase,[10] which would obviously hold a prior position in each project's capital structure.

---

[4] ECF No. 91 at 215:18.

[5] *Id.* at 215:14–15.

[6] ECF No. 90 at 100:7–17; 101:22–102:4.

[7] *See, e.g.*, ECF No. 91 at 235:9–16; 238:13–16; 240:1–4.

[8] ECF No. 90 at 100:20–101:8; 104:23–105:2.

[9] *See* Pl.'s Ex. 18.

[10] According to the pitch deck, the Felix Avenue property was worth $572,000 and the loan was $429,000. The Palm Circle property was valued at $1,465,000 with a loan of $1,100,000. Pl.'s Ex. 19.

As with many real estate investments, the project was manifestly very risky. In light of this, as well as his agreement to provide a guarantee, Mr. Giarratano agreed to receive "above market" returns of 14% APR: $14,000 per year for the Felix Avenue property and $28,000 per year for the Palm Circle property.[11] Even in the pitch deck, which of course one would expect to err on the side of optimism, the excess cash flow projected to make these payments to Mr. Giarratano is remarkably tight: the estimated annual profits were $18,925 for the Felix Avenue property and $29,455 for the Palm Circle property.[12] Notably, if you subtract the payment to Mr. Giarratano from the pitch deck estimates for each property, the margin is very thin. In other words, if anything went less well than expected (which of course is common in real estate development projects), or if the market did not continue to thrive (which of course is common given the volatility of real estate) it was always going to be difficult to make all of the promised payments to Mr. Giarratano. This is evident from the pitch deck itself.

Entity defendant "FFTX Holding, LLC – 6107P, Protected Series" was to own the Palm Circle home, and entity defendant "FFTX Holding LLC – 6206F2, Protected Series" was to own the Felix Avenue home. Mr. Giarratano signed a membership agreement with each respective entity outlining the interest payments he was to receive. Prior to signing and investing, Mr. Giarratano was also provided with documentation that stated that the properties were "to be contributed" to the entities (language that, importantly, indicated to all that the properties had not yet in fact been contributed). Mr. Giarratano wire transferred his investment on March 3, 2023.

The relationship between Mr. Giarratano and the LeFortunes quickly soured. The May 2023 interest check was sent out late.[13] The LeFortunes failed to timely provide statements and other financial information to Mr. Giarratano.[14] For his part, Mr. Giarratano did not provide his financial information to the broker who was to handle the refinancing of the loans on the properties. Because of the lack of guarantee, it became difficult to roll the construction loan on each property into a

---

[11] *Id.*; Pl.'s Ex. 18.
[12] Pl.'s Ex. 19.
[13] Pl.'s Ex. 50.
[14] *E.g.*, Pl.'s Ex. 48.

long-term loan with favorable terms.[15] Consequently, the properties were never able to become profitable short-term rentals.

In July of 2023, the Felix Avenue property was sold without Mr. Giarratano's knowledge or consent.[16] In an effort to mitigate damages, the LeFortunes purportedly transferred Mr. Giarratano's interest to the other home on the same lot as the original Felix Avenue property.[17] This second home was bigger and worth more.[18] However, that venture also apparently failed.[19] The Palm Circle home was sold in a foreclosure sale.[20]

The LeFortunes filed a voluntary petition for Chapter 7 bankruptcy on September 11, 2024.[21] Mr. Giarratano filed this adversary proceeding on December 16, 2024, objecting to discharge under 11 U.S.C. §§ 523(a)(2)(A) and (B), 523(a)(4), and 523(a)(6); seeking various declarations from this Court; bringing state law claims of money had and received, breach of contract, fraud, and fraud in a real estate transaction; and seeking to pierce the corporate veil as to entities controlled by the LeFortunes.

On May 23, 2025, Mr. Giarratano filed a *Motion for Leave to Amend Complaint and Join Necessary Parties* (ECF No. 36), which this Court granted in part and denied in part (ECF No. 68). Mr. Giarratano's live pleading (ECF No. 66) names the debtor-defendants as well as FFTX Holding, LLC, Fortunate Foundations, LLC, FFTX Holding, LLC – 6107P, Protected Series, FFTX Holding LLC – 6206F2, Protected Series, 202311 WY-04, LLC, 2021 TX-02, LLC, and 2021 TX-05, LLC.

---

[15] *E.g.*, ECF No. 91 at 240:9–12. *Cf.* ECF No. 90 at 114:10–18 (explaining that the refinance would have been "much more financially viable" had Mr. Giarratano provided his guarantee).
[16] Pl.'s Ex. 3; *see, e.g.*, ECF No. 91 at 160:14–15; ECF No. 90 at 61:21–23.
[17] ECF No. 90 at 55:15–17; ECF No. 91 at 237:1–6.
[18] ECF No. 91 at 237:1–6, 241:11–13; Defs.' Ex. 16.
[19] While there was not direct evidence that the other Felix Avenue unit was sold, both parties seemed to acknowledge that the defendant entities do not have assets. The debtor-defendants' amended schedules (Case No. 24-11109, ECF No. 29) also do not list this property as an asset. Additionally, testimony from Sharon Radovich, who invested in both Felix units, seems to imply that both units were sold. *See* ECF No. 91 at 80:25–81:13.
[20] ECF No. 90 at 112:3–10; ECF No. 91 at 245:4–5.
[21] Case No. 24-11109, ECF No. 1.

5

## Legal Background

To have a debt deemed nondischargeable, a creditor must establish one of the statutory discharge exceptions by a preponderance of the evidence.[22] These exceptions apply only "when, in Congress's judgment, the creditor's interest in recovering a particular debt outweighs the debtor's interest in a fresh start."[23] The discharge exceptions "are construed strictly against the creditor and liberally in favor of the debtor."[24]

Mr. Giarratano has sought to bar the LeFortunes' discharge under sections 523(a)(2)(A) and (B), 523(a)(4), and 523(a)(6) of the Code.

Section 523(a)(2)(A) excepts from discharge a debt obtained by "false pretenses, a false representation, or actual fraud, other than a statement representing the debtor's or an insider's financial condition."[25] To establish nondischargeability under this section, "a creditor must show actual fraud as opposed to merely constructive fraud."[26]

Section 523(a)(2)(B) excepts from discharge a debt obtained by "use of a statement in writing (i) that is materially false, (ii) respecting the debtor's or an insider's financial condition, (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; (iv) and that the debtor caused to be made or published with intent to deceive."[27]

"A creditor must prove the debtor's intent to deceive in order to obtain a non-dischargeability judgment under both § 523(a)(2)(A) and § 523(a)(2)(B)."[28]

---

[22] *Cowin v. Countrywide Home Loans, Inc. (In re Cowin)*, 864 F.3d 344, 349 (5th Cir. 2017) (citing *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

[23] *Bartenwerfer v. Buckley*, 598 U.S. 69, 72 (2023).

[24] *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009).

[25] 11 U.S.C. § 523(a)(2)(A).

[26] *Kleindienst v. Horne (In re Horne)*, No. 10-5063-C, 2011 WL 350473, at *8 (Bankr. W.D. Tex. Feb. 2, 2011).

[27] 11 U.S.C. § 523(a)(2)(B).

[28] *Friendly Fin. Serv.-Eastgate Inc. v. Dorsey (In re Dorsey)*, 505 F.3d 395, 399 (5th Cir. 2007).

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[29] "To meet the definition of 'embezzlement,' there must be proof of the debtor's fraudulent intent in taking the property."[30]

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[31] A simple breach of contract seldom arises to "willful and malicious" behavior unless the breach was accompanied by willful and malicious tortious conduct.[32] "Thus, even where a debtor intentionally breaches a contract without cause, such action would not rise to 'willful and malicious' conduct without further showing of tortious behavior."[33]

To prove a breach of contract under Texas law, a plaintiff must prove 1) there is a valid, enforceable contract, 2) the plaintiff performed or was excused from performing its contractual obligations, 3) the defendant breached the contract, 4) the defendant's breach injured the plaintiff.[34]

The elements of a common-law fraud claim under Texas law are:

(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew that it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.[35]

---

[29] 11 U.S.C. § 523(a)(4).

[30] *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602–03 (5th Cir. 1998).

[31] 11 U.S.C. § 523(a)(6).

[32] *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998); *Williams v. Int'l Bhd. of Elec. Workers Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003).

[33] *City Ctr. Wichita Falls, LLC v. Harwell (In re Harwell)*, 23-05028-mnp, 2024 WL 332876, at *8 (Bankr. W.D. Tex. Jan. 26, 2024).

[34] *Pathfinder Oil & Gas, Inc. v. Great Western Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019) (citing *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018)).

[35] *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. Of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)).

7

The plaintiff must prove both that it actually and justifiably relied on the representation.[36]

Fraud in a real estate transaction, however, is a claim for statutory fraud under Texas law, found in the Texas Business and Commerce Code:

> (a) Fraud in a transaction involving real estate . . . consists of a
>> (1) false representation of a past or existing material fact, when the false representation is
>>> (A) made to a person for the purpose of inducing that person to enter into a contract; and
>>> (B) relied on by that person in entering into that contract; or
>> (2) false promise to do an act, when the false promise is
>>> (A) material;
>>> (B) made with the intention of not fulfilling it;
>>> (C) made to a person for the purpose of inducing that person to enter into a contract; and
>>> (D) relied on by that person in entering into that contract.[37]

These elements are "essentially the same as the elements of common law fraud," except as to certain aspects of the calculation of damages.[38]

## Analysis

### A. The parties' agreement included Mr. Giarratano's guarantee, and he didn't provide it.

Mr. Giarratano and his lawyer insisted at trial that because the membership agreement lacked the guarantee, "[i]t wasn't part of the agreement."[39] The Court finds this to be completely implausible and strongly contrary to the evidence in this case. As noted, the guarantee was a bargained-for term (its influence on the agreed-

---

[36] *JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 653 (Tex. 2018) (citing *Grant Thorton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010)).
[37] Tex. Bus. & Com. Code Ann. § 27.01(a) (West 1983).
[38] *Miller v. Argumaniz*, 479 S.W.3d 306, 314 (Tex. App—El Paso 2015, pet. denied).
[39] ECF No. 91 at 148:2; s*ee id.* at 116:25–117:7; 147:20–148:2.

upon interest rate for repayment of Mr. Giarratano's investment was explicitly discussed in emails as early as February 2023[40]). It was plainly part of the deal.

Texas law recognizes, as does the general common law, that contracts can be composed of objectively determinable terms spread across various documents or conversations.[41] The contract between these parties was such an agreement. There is not one single integrated document reflecting all aspects of this transaction. It does no good in retrospect to lament that choice or to opine that the parties could have or should have entered into a single integrated document reflecting all the terms of their deal.[42] We must live with what the parties actually did and try to ascertain the contours of their agreement.

Here, the substantial and credible documentary and testimonial evidence clearly establishes that Mr. Giarratano was under a contractual obligation to act as "co-guarantor."[43] While the guarantee was a crucial part of the negotiated bargain, its exact amount appears never to have been memorialized. The best evidence at trial was that the parties anticipated it would be for the amount of the loans described in the pitch deck: $429,000 for the Felix Avenue property and $1,100,000 for the Palm Circle Property.[44]

Both parties complied with *part* of their end of the bargain, in that Giarratano funded his investment, and the debtors, through their entities, transferred him a membership interest in each purported "owning entity." But both parties also failed to live up to part of their ends of the bargain: Giarratano never gave his personal guarantee, and in fact never even provided the financial information to the broker responsible for negotiating it; for their part, the debtors' entities never actually transferred the properties into the "owning entities."

---

[40] *E.g.*, Pl.'s Ex. 18 at 3 (February 25, 2023 email stating "We are offering a higher APR because you will be a guarantor on the loan . . . ."); *id.* at 2 (February 28, 2023, email stating "I said on the last email you will be a guarantor, but it's actually a Co-guarantor with Laurence, and I.").

[41] *E.g., Board of Ins. Comm'rs v. Great So. Life Ins. Co.*, 239 S.W.2d 803, 809 (Tex. 1951); *Veal v. Thomason*, 159 S.W.2d 472, 475 (Tex. 1942).

[42] *See West v. Quintanilla*, 573 S.W.3d 237, 243 (Tex. 2019) (explaining the effect of an integrated agreement).

[43] Pl.'s Ex. 18 at 2.

[44] Pl.'s Ex. 19.

The debtors claim that they intended to transfer the property as promised but couldn't until their prior loans were removed by the very refinancing of which Giarratano's investment was to be a part. This is an explanation that the Court finds very credible. The Court believes that a reasonable investor in this scheme would have understood this aspect of the deal.[45]

The debtors appear to have tried to work around Mr. Giarratano's unwillingness to provide his guarantee. But the debtors also claim that Giarratano's failure to provide his guarantee made this process, at best, substantially more burdensome than it would otherwise have been. Thus, in their view, along with adverse market conditions in mid- to late-2023, Giarratano himself bears substantial responsibility for the failure of the projects and the loss of his investment. The Court also finds this credible.

By contrast, Giarratano claims that he didn't want to cooperate with the guarantee process at least until he received sufficient financial information to assuage certain concerns he had developed about the business. The Court finds his testimony concerning his doubts to be credible. Unfortunately, these doubts developed after he had already entered the agreement and invested his money. His doubts arising after the deal had been entered, as well as the debtors' response to those doubts, don't undermine the other facts weighing against a finding that the debtors had fraudulent intention or that any injury was willful.

Ultimately, Mr. Giarratano's unwillingness to provide the agreed-upon guarantee provides a substantial and very reasonable explanation for the refinancing never to have gone through. This explanation for the lack of refinancing—required for the deal to actually get off the ground—weighs against the argument that the debtors intended for the deal to be a fraud. To the contrary, this evidence supports the notion that the debtors intended to perform (and strived to close the refinancing even without Mr. Giarratano's guarantee) but were unable to do so.[46]

---

[45] In fact, Mr. Giarratano testified that he had personal experience with rolling a construction loan into a permanent loan. ECF No. 91 at 203:20–204:22.

[46] The Court also notes that Mr. Giarratano himself was unable to provide any evidence that his investment money "didn't go where it was supposed to go." ECF No. 91 at 196:2–6.

**B. The debtors' transfer of one of the Felix Avenue units is suspicious but is not sufficient to carry the day as to the debtors' intentions or as to any damages related to this breach of the agreement**.

The most powerful fact against the debtors is that they actually sold the particular Felix Avenue property that was supposed to be one of Mr. Giarratano's investments in late July and failed to inform him of that fact even as they later emailed about other aspects of the deal (including his guarantee).[47]

The debtors' explanation, though, was that this course of action was necessitated by the poor finances of the project, particularly because Giarratano had already by that point refused to provide a guarantee in conversations they had with him. Although there was no documentary evidence of the conversations, the Court finds this testimony plausible, and it went uncontroverted. In addition, the debtors insist they saw no harm in this course of action because they "replaced" Unit B/Unit 2 (as it is known in various documents) with Unit A/Unit 1, which is on the same general parcel of land and that they testified was more valuable anyway.[48] This testimony too went uncontroverted.

Obviously, this undisclosed, switcheroo transfer does not represent an ideal business practice. And the Court believes that it is likely that the debtors knew that they were being less than fully honest by failing to at least disclose the change in properties or plans to the plaintiff. But the Court also notes some mitigating aspects of this transfer from the side of the debtors: (1) they were substituting not some unit on the other side of town or in an economically distinct area or neighborhood or type of property, rather it was the other unit on the same property, (2) the uncontroverted evidence is that the other unit was more valuable,[49] and (3) the testimony was that even by July, before the later email traffic on the issue, the guarantee had already been refused and thus the original deal was looking extremely unlikely.[50]

For these reasons, ultimately, weighing all the testimony and other evidence, the Court simply doesn't believe that the debtors' intent was to defraud plaintiff. At

---

[47] *See* Pl.'s Ex. 3 (deed describing sale of the Felix Avenue Property on July 25, 2023); *see, e.g.,* Pl.'s Ex. 44 (August 23, 2023 email about the guarantee).
[48] ECF No. 91 at 237:3–6.
[49] ECF No. 91 at 241:11–13; ECF No. 90 at 62:5–6.
[50] ECF No. 91 at 233:14–20; 234:16–25; ECF No. 90 at 51:8–52:22.

11

the time of the transfer, the credible testimony is that they intended to perform with the originally contemplated property. This is the most (and perhaps only) relevant time frame because it is when the deal was made and the money invested.[51] Had the debtors *always* intended to substitute a different piece of property, plaintiff would have a stronger argument that they intended to defraud him. However, here, the testimony shows that the transfer was an attempt to salvage a deal that had already strayed onto shaky ground.

The plaintiff claims that the fact that the "owning entity" didn't own the property immediately at the time the deal was entered into shows fraudulent purpose.[52] But the debtors' response is very plausible and credible: the property hadn't been transferred yet because the refinancing was required prior to the transfer in order to take out the existing loan, and the refinancing process would take time (and the guarantee). Further, Mr. Giarratano admitted on cross-examination that prior to making his investment, he was provided with the series agreement for the 6206F entity, which stated that the Felix Avenue property was "to be contributed" to the series.[53] Something that is "to be contributed" has not yet been contributed; he was on notice that the entity was not yet the "owning entity."

The Felix Avenue transfer may not be relevant to the fraud analysis at all, because Mr. Giarratano had already entered into the agreement at that point.[54] True, it seems that by the time of the transfer, the intention no longer was to perform on the agreements exactly as written, and there was likely intentional concealment or deception as to that fact. But there does not appear to have been any *actual effect* on Mr. Giarratano given that he refused to guarantee the debt, and if anything, his financial interests were strengthened by the switch. What appears to have happened is that after the agreement had already been entered into and had begun going south (including by virtue of a lack of Mr. Giarratano's guarantee), actions were taken out

---

[51] *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006) ("Breach alone is no evidence that breach was intended when the contract was originally made."); *see also* Pl.'s Am. Compl., ECF No. 66, at 20 (stating Plaintiff "would not have invested but for [debtors'] representations").

[52] *See, e.g.*, Pl.'s Am. Compl., ECF No. 66 at 20.

[53] Pl.'s Ex. 30; ECF No. 91 at 180:3–22.

[54] *See Tony Gullo Motors I, L.P.*, 212 S.W.3d at 305.

of an intention to "salvage the deal."[55] These *later* actions do not change the Court's conclusion that at the *outset*, the LeFortunes' intention was not to defraud or harm Mr. Giarratano. And even leaving aside that Mr. Giarratano was benefitted by the substitution of a more valuable over a less valuable property, the switching of Felix Avenue properties cannot possibly have damaged Mr. Giarratano, given that he didn't take any steps to enter into a guarantee after that point.

In other words, the evidence does not support fraudulent intent at the *outset*; and, with respect to this *later* course of dealing, Mr. Giarratano could not have been fraudulently induced into a guarantee he did not in fact enter into.

## C. There are insufficient grounds for veil piercing or alter ego liability.

There are two potential ways for any debts to Mr. Giarratano to be held nondischargeable: either by the debtors' own fraud or by their entities' debts being attributed to them by veil piercing or alter ego doctrines. Above, I found that the debtors haven't been proven to have committed fraud. This eliminates Plaintiff's objections to discharge under 11 U.S.C. § 523(a)(2)(A) and (B) and § 523(a)(4).[56] Likewise, Plaintiff's state law claims for fraud and fraud in a real estate transaction fail. Further, again because their intention was for the deal to go well and not to fail,[57] I found that the debtors have not willfully and maliciously injured the Plaintiff, eliminating his objection to discharge under 11 U.S.C. § 523(a)(6).

In this Section, I find that the debtor-defendants cannot be held liable through veil piercing or alter ego doctrines.

Plaintiff alleged that this Court should pierce the corporate veils of the defendant entities and hold the LeFortunes individually liable because "(1) the corporate fictions were used as a means of perpetrating fraud; (2) the corporations were organized and operated as a mere tool or business conduit of another

---

[55] There was also uncontroverted testimony that the LeFortunes attempted to give Mr. Giarratano the Palm Circle property, which had about $300,000 in equity, in an attempt to remedy the situation, but Mr. Giarratano refused. ECF No. 90 at 110:23–112:2. While the Court does not fault Mr. Giarratano for declining the property after the relationship between the parties had already unraveled, this gesture does show that the LeFortunes were still trying to make the situation right and, in the Court's opinion, weighs against fraudulent intent.

[56] *See In re Dorsey*, 505 F.3d at 399; *In re Miller*, 156 F.3d at 602–03.

[57] *E.g.,* ECF No. 91 at 14–17.

corporation; and/or (3) the corporate fictions were resorted to as a means of evading an existing legal obligation."[58] This Court disagrees.

Under Texas law, "corporate shareholders, officers, and directors are generally shielded from liability for corporate obligations."[59] However, by piercing the corporate veil, a court may disregard the corporate fiction and impose personal liability on those who would otherwise be shielded.[60]

Circumstances under which a court may pierce a corporate veil fall into three broad categories: "(1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate a fraud."[61] Essentially, the law does not permit the use of the corporate form to shield from "fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like."[62]

The evidence is nowhere near sufficient to sustain this theory of liability. The debtors credibly testified about the large number of entities they were associated with. The Court found their explanation credible. It is quite common, and sensible, to set up and conduct business through a number of entities when engaging in the sort of complex, multiproperty, multiparty real estate investment, development, and financing that the debtors and their entities were engaged in.[63] Perhaps they went a little bit overboard in the sheer number of entities created, but they credibly testified that this was on the advice of counsel, and in any case, the Court simply doesn't see any nefariousness in it all. Mr. Giarratano could have but did not receive a guarantee from the LeFortunes themselves of the debts of the entities with which he was contracting; the Court has no basis to include one now retroactively.

---

[58] Dkt. No. 66 at 21.

[59] *Keyes v. Weller*, 692 S.W.3d 274, 278 (Tex. 2024) (citing *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006)).

[60] *See Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1035 (5th Cir. 2010) (citing *Gulf Reduction Corp. v. Boyles Galvanizing & Plating Co.*, 456 S.W.2d 476, 480 (Tex. App.—Fort Worth 1970, no writ)).

[61] *Rimade Ltd. v. Hubbard Enters., Inc.*, 388 F.3d 138, 143 (5th Cir. 2004) (citing *W. Horizontal Drilling v. Jonnet Energy Corp.*, 11 F.3d 65, 67 (5th Cir. 1994)).

[62] *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008).

[63] *E.g., id.* at 455 ("Creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace.").

There are minor discrepancies in some documents, which were credibly explained as mistakes or as necessities of various technical aspects of the business in which the debtors were engaged. There were also minor examples of commingling of some business and personal assets (though not Mr. Giarratano's investments). Commingling of finances can be a relevant factor in the alter ego analysis,[64] but under the facts here, it was simply not shown to be more than incidental commingling of assets not impacting the deal with Mr. Giarratano. And as for general failure to abide all corporate formalities, Texas law (as with most other jurisdictions) is clear that a failure to abide by the corporate form is not enough to support veil piercing or to treat entities as alter egos of their owners.[65]

In short, the Court does not believe the entities were used as vessels of obfuscation, trickery, fraud, or abuse of those doing business with the debtors. The evidence at trial simply did not bear out the plaintiff's arguments. Again, this isn't to condone all of the debtors' business practices or to give them the Court's "blessing." The Court has no authority to confer such blessings, and this opinion should not be read to do so. Rather, this is merely to say that the high standards for veil piercing or alter ego liability—which, to be clear, the Court will have no hesitation imposing in an appropriate case—just aren't met here. Accordingly, the Court cannot engage in veil piercing or treat the entities as the debtors' alter egos.

---

[64] To be sure, commingling of assets is part of the veil-piercing analysis. *E.g.*, *Durham v. Accardi*, 587 S.W.3d 179, 185 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("Evidence that will support an alter ego finding includes (1) the payment of alleged corporate debts with personal checks or other commingling of funds, (2) representations that the individual will financially back the corporation, (3) the diversion of company profits to the individual for the individual's personal use, (4) inadequate capitalization, and (5) any other failure to keep corporate and personal assets separate." (citing *Burchinal v. PJ Trailers-Seminole Mgmt. Co.*, 372 S.W.3d 200, 218 (Tex. App.—Texarkana 2012, no pet.))).

[65] Tex. Bus. Orgs. Code Ann. § 21.223(a)(3) (West 2007); *Penhollow Custom Homes, LLC v. Kim*, 320 S.W.3d 366, 372 (Tex. App.—El Paso 2010, no pet.) ("Under Section 21.223(a)(3), the failure of a corporation to observe any corporate formality is no longer a factor in considering whether alter ego exists.").

**D. Defendants FFTX Holding, LLC –6107P, Protected Series and FFTX Holding, LLC – 6206F2, Protected Series breached their contracts with Mr. Giarratano**.

The written membership agreements clearly obligated two of the Debtors' affiliate entities, Defendants FFTX Holding, LLC – 6107P, Protected Series and FFTX Holding, LLC – 6206F2, Protected Series, to make interest payments to the Plaintiff.[66] Pursuant to the membership agreements, the entities were supposed to pay Mr. Giarratano a fixed annual rate of 14% interest on his respective investments in each entity.[67] They did not do so. This is a breach of contract.

Accordingly, the Court holds that defendant entities FFTX Holding, LLC – 6107P, Protected Series and FFTX Holding, LLC – 6206F2, Protected Series owed the payments to Mr. Giarratano and are each liable for breach of contract in failing to provide them. The debtor-defendants and other entity defendants (FFTX Holding, LLC, Fortunate Foundations, LLC, 202311 WY-04, LLC, 2021 TX-02, LLC, and 2021 TX-05, LLC) are not liable for breach of contract. Although communications about the agreements were, at times, transmitted through the other defendants, Mr. Giarratano was aware that the membership agreements he signed were in the names of FFTX Holding, LLC – 6107P, Protected Series and FFTX Holding, LLC – 6206F2, Protected Series only. Those entities are liable for breach of contract damages. The amount of damages is discussed below.

**E. Money Had and Received**

Plaintiff brings a state law claim of money had and received against all defendants. Under Texas law, money had and received is an equitable remedy applied to "prevent unjust enrichment and 'to restore money where equity and good conscience require [a] refund.'"[68] As such, a claim for money had and received is "properly characterized as based on a debt not evidenced by a writing" and is

---

[66] *See* Pl.'s Ex. 25 and 26 (membership agreements). Technically, it appears that Mr. Ramirez (a/k/a LeFortune) signed the 6107P agreement as managing member of the 6206F2 entity, but he has not relied on this typo to contest that the 6107P entity was bound by this contract, and the Court finds that it was in fact bound.

[67] There is some uncertainty as to whether the obligation was to "mature" in two or five years. *E.g.*, ECF No. 91 at 114:3–10, 195:20–23. The Court addresses damages below.

[68] *Aaron v. Fisher*, 645 S.W.3d 299, 308 (Tex. App.—Eastland 2022, no pet.) (quoting *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 302 n.4 (Tex. 2015)).

16

generally unavailable where a contract governs the parties' obligations.[69] However, "when the existence of or the terms of a contract are in doubt," the burden lays on the defendant to "secure findings from the trial court that an express contract exists that covers the subject matter of the dispute."[70]

Here, as discussed above, the member agreements outlining the terms of the loan and the interest rate govern this dispute.[71] Thus, the breach of contract claim is an adequate remedy at law, and this Court need not reach equitable remedies.[72] Plaintiff's claim for money had and received is therefore denied as to all defendants.

## F. Suit for Declaration

Plaintiff asks the Court for declaratory relief on a variety of claims. Bankruptcy courts may grant such relief under the Declaratory Judgment Act, which states: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."[73] Courts have discretion whether to grant declaratory relief.[74] "The purpose of the Declaratory Judgment Act is to settle 'actual controversies' before they ripen into violations of law or the breach of some contractual duty."[75] Here, Plaintiff asks this Court to declare that "(1) the Agreements establish an interest in the Properties purportedly securing his investments; (2) additionally or in the alternative, the Agreements establish an interest in the 'owning LLC.'"[76]

---

[69] *Friberg-Cooper Water Sup. v. Elledge*, 197 S.W.3d 826, 831 (Tex. App.—Fort Worth 2006), *rev'd on other grounds*, 240 S.W.3d 869 (Tex. 2007); *GRCDallasHomes LLC v. Caldwell*, 619 S.W.3d 301, 308 (Tex. App.—Fort Worth 2021, pet. denied) (citing *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683 (Tex. 2000)).
[70] *Fortune Prod. Co.*, 52 S.W.3d at 685.
[71] The defendants requested this finding in their *Defendants' Proposed Findings of Fact and Conclusions of Law* (ECF No. 60 at 2).
[72] *See Rogers v. Daniel Oil & Royalty Co.*, 110 S.W.2d 891, 894 (Tex. 1937) ("In cases where an adequate and complete remedy at law is provided, our courts, though clothed with equitable jurisdiction, will not grant equitable relief.").
[73] 22 U.S.C. § 2201.
[74] *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995) (citing *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494 (1942)).
[75] *Hardware Mut. Cas. Co. v. Schantz*, 178 F.2d 779, 780 (5th Cir. 1949).
[76] Pl's. Am. Compl., ECF No. 66 at 18.

17

First, this Court declines to declare Plaintiff's interest in any property. The record does not support the Plaintiff's requested declarations. The agreements between Plaintiff and the entities are facially membership agreements that do not purport to grant any security interest in any property. However, even if Plaintiff was able to establish a retrospective lien on either property (although both properties have been sold), Plaintiff certainly would not have priority over the prior liens. With regard to the Palm Circle property, any theoretical lien Plaintiff may claim to hold to would have been extinguished when that property was sold in a foreclosure sale. Finally, Plaintiff's request that this Court declare that his alleged interest "attaches to the proceeds from the sale of either Property" is moot, as the uncontroverted testimony was that there were no excess proceeds from either sale.[77]

As to the remaining requests for declaratory judgment, the litigation has progressed past the point of needing a declaration of the parties' rights.[78] Declaratory judgment is a discretionary remedy.[79] This Court, then, chooses to exercise its discretion and decline declaratory relief in favor of other remedies. Therefore, Plaintiff's suit for declaration is dismissed.[80]

## G. The Court will order further briefing on damages if the parties do not reach an agreement on them.

Calculating the breach of contract damages awarded above is somewhat difficult. Attorney's fees with respect to this breach of contract claim are also available, under governing Texas law.[81] The Court will need to determine the issue of breach of contract damages based on evidence already in the record, and it will

---

[77] *Cf. Blackwell v. Rio Mgmt. (In re Blackwell ex rel. Est. of I.G. Servs., Ltd.)*, 267 B.R. 732, 740 n.11 (Bankr. W.D. Tex. 2001) ("A declaratory judgment is a discretionary remedy that courts should be reluctant to apply unless a controversy is ripe.").

[78] *See 400 Walnut Assocs. v. 4th Walnut Assocs. (In re 400 Walnut Assocs.)*, 454 B.R. 60, 75 (Bankr. E.D. Pa. 2011) ("The [Declaratory Judgment] Act is intended to address uncertainty as to legal rights between the parties towards expediting a conclusion of a pending dispute or avoiding one altogether. The problem for the Debtor is that such purpose can hardly be served here and now."); *see also Hardware Mut. Cas. Co.*, 178 F.2d at 780.

[79] 22 U.S.C. § 2201; *Wilton*, 515 U.S. at 282.

[80] *See 400 Walnut Assocs.*, 454 B.R. at 74–75.

[81] Tex. Civ. Prac. & Rem. Code Ann. § 38.001(b)(8) (West 1985).

18

need briefing to do so. And the Court will need to determine the amount of appropriate attorney's fees, which could require an evidentiary hearing.

But the Court is somewhat unclear how much this will matter to any of the parties. Mr. Giarratano's ability to recover on his investment was, as all knew, largely or entirely going to depend on the equity value of the properties, which, due to the deals not succeeding, is zero.[82] Thus, it appears likely that a judgment against what appears now to be assetless and valueless entities is not worth much. The Court does not wish to force the parties to incur needless fees litigating over a judgment that may not be worth the proverbial paper it is written on.

Accordingly, the Court will order the parties to confer and make a joint filing concerning how they wish to proceed. If, for instance, they wish to stipulate to an amount for the breach of contract damages and/or the attorney's fees, then the Court could simply enter a judgment based on that agreement. If they don't agree on amounts but agree on some aspects of procedure, the Court would be happy to consider that agreement as well. In any case, the Court simply requests that the parties briefly explain where they are on substance and procedure of the breach of contract damages calculation in this joint posttrial filing. After it receives the joint posttrial filing, the Court will enter a scheduling order for further proceedings based on the joint filing as needed.

## Conclusion

Based on the record at trial and governing law, the Plaintiff prevails on his breach of contract claim against the two entities stated above and the Defendants prevail on the remaining counts.

# # #

---

[82] *See* ECF No. 90 at 130:17–131:2 (no proceeds on Felix Avenue property); ECF No. 91 at 105:14–22 (same); ECF No. 90 at 112:3–10 (Palm Circle property foreclosed); ECF No. 91 at 245:8–10 (no profit on Palm Circle property).